UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DIANA J. BROUILLETTE,

                Plaintiff,

  -against-                                          6:11-CV-0566 (LEK)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                Defendant.

## MEMORANDUM-DECISION and ORDER

**I.    BACKGROUND**

**A. Procedural History**

On November 3, 2008, Diana Jean Brouillette ("Plaintiff") filed a Title II Application for disability and social security disability insurance benefits. Dkt. No. 8-2 ("Transcript") at 11. Subsequently, on November 21, 2008, Plaintiff filed a Title XVI Application for supplemental social security income under the Social Security Act. Id. In both Applications, Plaintiff alleged that the onset of her disability as well as the date she resigned from her employment was May 2, 2007. Id. at 11, 30.

On February 4, 2009, the Commissioner denied both Applications, and on March 23, 2009, Plaintiff filed a timely written request for a rehearing before an Administrative Law Judge ("ALJ"). Id. at 11. Accordingly, on April 22, 2010, a video hearing was held in Syracuse, New York before ALJ John P. Ramos. Id. Plaintiff, represented by counsel, appeared in Utica, New York and testified at the hearing. Id. On August 9, 2010, ALJ Ramos issued a decision finding that Plaintiff was not entitled to disability insurance benefits as she was not disabled under §§ 216(i) and 223(d)

of the Social Security Act, nor was she entitled to supplemental social security income as she was not disabled pursuant to § 1614(a)(3)(A) of the Social Security Act. Id. at 22-23.

The present action was commenced pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) following the denial of Plaintiff's requested review of the ALJ decision by the Appeals Council on May 4, 2011. Tr. at 2-5. Defendant interposed an Answer on September 21, 2011. Dkt. No. 7. Plaintiff filed a Brief in Support of the present action on November 2, 2011. Dkt. No. 11. Defendant filed a Brief in opposition on December 19, 2011. Dkt. No. 13. On April 2, 2012, the Honorable Gary L. Sharpe, Chief United States District Judge for the Northern District of New York issued an Order terminating the referral to Magistrate Judge David E. Pebbles and directing the Court to decide this case directly without a Report and Recommendation. Dkt. No. 14.

**B. Medical Evidence**

*1. Dr. Kalyani Ganesh*

Plaintiff was seen by Dr. Ganesh on January 8, 2009 for a consultative internist evaluation, during which Plaintiff informed the doctor that she had ceased employment in May 2007. Tr. at 20. She informed Dr. Ganesh that she suffered from asthma, mitral valve prolapse, high blood pressure, underactive thyroid, allergies, vocal cord dysfunction, upper airway restriction, rhinitis, anxiety, fibromyalgia and depression. Id. Dr. Ganesh performed a Pulmonary Function Test and a physical examination that day, both of which reported normal results. Id.; Dkt. No. 8-8 at 81. Dr. Ganesh noted that Plaintiff did not demonstrate any gross limitations in her capacity for sitting, standing, walking, or the use of her upper extremities. Tr. at 20. Moreover, although Dr. Ganesh diagnosed Plaintiff with fibromyalgia, his assessment did not indicate the basis of such diagnosis, nor did he assess any motor or sensory deficiencies or musculoskeletal restrictions as a result of such

diagnosis.[1]  Id. at 18.  Based on his examination, however, Dr. Ganesh concluded that Plaintiff should avoid known respiratory irritants.  Id. at 20.

*2. Dr. David Petrie*

Dr. Petrie, a family medicine physician, had been treating Plaintiff since May 2005.  Id. at 20.  Dr. Petrie assessed clinical findings of abnormal oropharynx (red) and nasal congestion and diagnosed Plaintiff with Sick Building Syndrome.  Id. at 18.  As a result, Dr. Petrie prescribed Nasalcrom; however, on May 31, 2005, Plaintiff reported poor response to the medication.  Id.  Further, on June 1, 2005, Plaintiff indicated that she was having voice problems at her workplace.  Id.  Dr. Petrie felt Plaintiff had allergic rhinitis that was aggravated by the air conditioning at her workplace and accordingly recommended that she take Advair and Albuterol, since he noted that her nasal congestion continued even with the use of Nasalcrom.  Id.

*3. Dr. Brian C. Alessi*

In 2006, Dr. Petrie referred Plaintiff to an allergist, Dr. Alessi, who performed a skin test on Plaintiff.  Tr. at 18.  The test revealed that Plaintiff tested positive to several allergens.  Id.  Dr. Alessi also determined that Plaintiff suffered from allergic rhinitis, allergic asthma, and environmental exposure.  Dkt. 8-7 at 29.  Dr. Alessi concluded that Plaintiff was significantly allergic and that her symptoms seemed to be triggered by her work environment.  Id. at 29; Tr. at 18.  He prescribed different medication and recommended that Plaintiff try to work in a place other than the record room in which the air conditioning was located.  Tr. at 18.

*4. Dr. Eric Yoss*

---

[1] In addition to the diagnosis of fibromyalgia, Dr. Ganesh also diagnosed Plaintiff with the following: asthma, mitral valve prolapse, allergies, high blood pressure, hypothyroidism, rhinitis, and hypertension.  Dkt. No. 8-8 at 79-80.

3

Throughout 2006, Plaintiff was also treated by Dr. Yoss, a pulmonary disease specialist. Tr. at 18. After conducting a physical examination, Dr. Yoss determined that Plaintiff's throat was clear but assessed that she had significant sinus disease. Id. Based on Dr. Yoss's recommendation, a pulmonary function test was performed on November 15, 2006, and it revealed mild obstructive lung disease. Id. In addition, on the same day, a computerized tomography (CT) scan of the paranasal sinuses was performed but showed no evidence of mucoperiosteral disease or mass/lesion. Id. As a result, Dr. Yoss treated Plaintiff with Advair and Albuterol two to three times a week. Id. Subsequently, on November 29, 2006, Plaintiff indicated that she felt her condition was steadily improving and that was asymptomatic unless she was exposed to certain irritants. Id. Dr. Yoss, upon examination of Plaintiff, opined that she suffered from minimal nasal congestion and that her symptoms likely represented a mild case of reactive airways dysfunction syndrome or perhaps from exposure related to asthma. Id. at 19. Dr. Yoss concluded that although Plaintiff's condition had improved with modest symptoms remaining, he still suggested she had mild reactive airways disease. Id. at 19.

*5. Dr. José R. Rabelo*

Dr. Rabelo, a consulting expert physician, examined Plaintiff and provided an evaluation on May 20, 2010. Dkt. No. 8-8 at 149-51. He determined that Plaintiff had a history of asthma, underactive thyroid and fibromyalgia. Dkt. No. 8-9 at 8. Dr. Rabelo concluded that Plaintiff should avoid even moderate but not all exposure to fumes, odors, dusts and gases. Tr. at 21.

*6. Dr. Michael B. Lax*

The Record indicates that Plaintiff was also treated by Dr. Lax, an occupational medicine doctor between 2006 through 2010. Dkt. No. 8 (Exhibits 8F, 10F, 20F-22F); Dkt. No 8-7 at 86. On

4

October 18, 2006, Dr. Lax diagnosed Plaintiff with asthma, allergic rhinitis and vocal cord dysfunction, all of which were attributed to Plaintiff's workplace environment and mold exposure. Tr. at 19. At that time, Dr. Lax suggested that Plaintiff was capable of working part-time (20-30 hours). Id. Further, based on an examination date of October 10, 2007, Dr. Lax assessed that in addition to aforementioned diagnoses, Plaintiff also suffered from upper airway irritation, reactive anxiety and depression. Dkt. No. 8-7 at 80. By April 1, 2009 and through April 20, 2010, Dr. Lax assessed Plaintiff as totally disabled. Tr. at 19.

### 7. Other Physicians

Plaintiff's Brief does not dispute the ALJ's findings in regard to the medical opinions of Dr. Richard T. Kelley, Dr. Richard B. Evans, Dr. Jeanne Shapiro, Dr. Porus J. Dhabbar, and Dr. James M. Cimo. The Court has conducted a full review of the evidence set forth in the record and has determined that "substantial evidence" supports the findings of the ALJ with regard to these physicians and medical practitioners.

On February 13, 2007, Dr. Kelley, ENT, diagnosed Plaintiff with laryngopharyngeal reflux, muscle tension dysphonia, and irritable larynx. Tr. at 19. He suggested voice therapy and Prilosec for Plaintiff; however, he found no structural or neurological reason to explain Plaintiff's hoarse voice. Id.

Subsequently, on July 30, 2007, Plaintiff was examined by Dr. Evans, an occupational pulmonary medicine specialist. Tr. at 19. His examination of Plaintiff was unremarkable, and he indicated that the treatment for her muscle tension dysphonia started with voice therapy, which was already recommended by Dr. Kelley. Id. As a result, Dr. Evans concluded that Plaintiff could return to work; however, she would be more successful if she returned to work after starting voice

therapy.  Id.  Plaintiff was subsequently seen by Dr. Evans on August 18, 2008, at which point he again concluded that she could return to work.  Id.  Moreover, Plaintiff was also examined by Dr. Jeanne Shapiro, a consultant psychologist.  Id. at 20.  Dr. Shapiro diagnosed Plaintiff with Depressive Disorder NOS (not otherwise specified) and recommended that Plaintiff seek psychiatric treatment.  Id.

Finally, Plaintiff was also treated by the Slocum Dickson Medical Group from October 17, 2007 to June 26, 2008 where she was examined by Dr. Dhabbar and Dr. Cimo.  Tr. at 19.  Initially, Dr. Dhabbar found that Plaintiff suffered mild swelling of the inferior turbinates of the nose.  Id.  However, by March 2008, Dr. Dhabbar found that Plaintiff presented normal mucosa, septum, and turbinates.  Id.  In addition, Dr. Cimo's assessment of Plaintiff as of November 24, 2008 revealed that Plaintiff's asthma and mold allergy had not improved.  Dkt 8-8 at 34.

**C. Plaintiff's Testimony**

During her testimony, Plaintiff explained that because of her respiratory conditions, she generally stays at home.  On a typical day, Plaintiff explained that she reads novels, watches television, and does puzzles.  Tr. at 46-47.  She also does household chores including cooking, cleaning (with a mask on), doing laundry, washing the dishes, ironing, making beds, and dusting the house.  Id. at 14-15, 39, 43, 46-47.  Plaintiff reported that she had a driver's license and sometimes drove.  Id. at 15.  Plaintiff stated that she is usually taken to doctor's appointments by her daughter and that she occasionally goes shopping at Walmart, the Dollar Store, and/or Big Lots.  Id. at 43-44.  Additionally, Plaintiff goes grocery shopping every few weeks; however, because of her sensitivity to odors, she wears a mask in various parts of the store where she feels that she may become sick.  Id. at 40.

Plaintiff testified that due to her respiratory problems including allergies and asthma, she was forced to terminate her employment. Tr. at 38-39. She testified that she completed twelfth grade and completed some vocational training as a medical office assistant but never obtained a certificate for such training. Id. at 29. Prior to the alleged onset of her disability, Plaintiff was employed by Costello Eye Physicians and Surgeons as an ophthalmic technician, where she tested patients and conducted exams prior to the ophthalmologist's examination of patients. Id. at 30. Before that, Plaintiff worked at Faxton St. Luke's Medical Office in the medical records room where she input patient data on the computer system, performed general administrative duties, and occasionally assisted patients into the hospital rooms. Id. at 32. Prior to that, Plaintiff worked at Stewart's Convenience Store as an assistant manager of the store; there, her duties including clerical work, scheduling, cashing in and out, and opening and closing the store. Id. at 33.

## II.  STANDARD OF REVIEW

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Instead, a reviewing court will only reverse the Commissioner's determination if the correct legal standards were not applied or if the determination was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles"); see Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

The substantial evidence standard requires evidence amounting to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). If the evidence is deemed susceptible to more than one rational interpretation, then the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). That is, the Court must afford the Commissioner's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act.[2] See 20 C.F.R. §§

---

[2] This five-step process is detailed as follows:
> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the

8

416.920, 404.1520. The Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, and the five-step process remains the proper approach for analyzing whether a claimant is disabled. 482 U.S. 137, 140-42 (1987). While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582 (2d Cir. 1984). The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g), 404.1520(g); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

**III.   DISCUSSION**

**A. Commissioner's Decision**

In his decision, the ALJ conducted a *de novo* review of the available evidence and medical records. The ALJ, with regard to the factual information and with consideration of the aforementioned five-step analysis, first determined that Plaintiff had met the insured status requirements of the Act through December 31, 2012 and had not engaged in substantial gainful activity since the alleged onset date, May 2, 2007. Tr. at 12-13. Second, the ALJ determined that Plaintiff's bronchial asthma, laryngeal tension disorder, and depressive disorder are severe impairments. Id. Third, after reviewing the entire record, the ALJ determined that Plaintiff did not

---

> [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. §§ 416.920, 404.1520.

have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).[3] Next, the ALJ determined that Plaintiff was unable to perform any past relevant work as defined in 20 C.F.R. § 404.1565. Tr. at 21. Finally, the ALJ determined that Plaintiff had the residual function capacity to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c). Id. at 16. Specifically, the ALJ found that although Plaintiff has some difficulty in concentration and attention, she still had the capacity to engage in unskilled mental functions and handle reasonable levels of simple, repetitive work-related stress. Id. at 20. More importantly, however, the ALJ noted that due to Plaintiff's bronchial asthma and allergic conditions, Plaintiff should avoid more than moderate exposure to respiratory irritants such as fumes, odors, dust, gases, poor ventilation, extreme temperatures, and humidity. Id. at 16. Ultimately, the ALJ found that Plaintiff retained the ability to understand and follow simple instructions and directions allowing her to perform simple tasks independently and with supervision. Id. The ALJ determined that there were a full range of "medium work" jobs that exist in significant numbers in the national economy that Plaintiff could perform despite her medical limitations. Id. at 22.

As stated *supra*, the ALJ's decision became the Commissioner's final decision on May 4, 2011, when the Appeals Council denied Plaintiff's request for review. Id. at 5.

---

[3] Specifically, the ALJ considered Listing 3.00, Respiratory System, and Section 3.03, Asthma as those were relevant to Plaintiff's medical conditions. Tr. at 15. In addition, the ALJ conducted an analysis of Plaintiff's mental capacity and impairment by evaluating Section 12.04 of the Listing of Impairments. Id. Specifically, the ALJ evaluated Plaintiff's capacity pursuant to "paragraph B" and determined that Plaintiff did not satisfy the criteria as she has not experienced any episodes of decompensation for an extended period nor has she possess any marked mental limitation. Id. at 15-16.

**B. Plaintiff's Claims**

Plaintiff contends that the Commissioner's decision in this case should be reversed. Dkt. No. 11 ("Plaintiff's Brief") at 15. In support of this contention, Plaintiff relies on three principal arguments. First, Plaintiff asserts that the ALJ's determination of Plaintiff's residual functional capacity ("RFC") for work is not supported by substantial evidence. Id. at 4. Second, Plaintiff argues that the ALJ's decision failed to interpret the medical opinion of Dr. Rabelo properly. Id. at 9. Lastly, Plaintiff asserts that the ALJ failed to give controlling weight to the medical opinion of the treating source thereby failing to follow the "treating source rule." Id. at 11. The Court addresses each of these claims separately.

*1. The ALJ's Determination of Plaintiff's RFC*

The Social Security Act outlines a five step evaluation process that is to be utilized by the ALJ in determining whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Specifically, at Step Four of the analysis, the ALJ must determine Plaintiff's RFC. 20 C.F.R. §404.1520(a)(4)(iv), (e); 20 C.F.R. §416.920(e). RFC is:

> what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.

Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *2 (SSA July 2, 1996). In assessing the RFC of an individual, the ALJ must consider the individual's impairment "and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [the individual] can do in a work setting." 20

C.F.R. §404.1545(a)(1). Accordingly, the ALJ must assess the RFC based on all relevant and medical evidence in the record. 20 C.F.R. §404.1520(e); 20 C.F.R. §404.1545(a)(3). Ultimately, the RFC is used to determine whether an individual can perform past work. 20 C.F.R. §404.1545(a)(5)(i). If however, it is concluded that the individual, based on her RFC cannot perform past work, then the ALJ utilizes the RFC to evaluate Step Five to render whether the individual can adjust to other work that exists in the national economy. 20 C.F.R. §404.1545(a)(5)(ii).

Specifically, at Step Five the burden of proof shifts to the Commissioner in showing "there is other gainful work in the national economy [which] the claimant could perform." Balsamo v. Chater, 142 F. 3d 75, 80 (2d Cir. 1998). The ALJ's determination at Step Five of the analysis consists of two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. 20 C.F.R. § 404.1520 (a)(4)(v). Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g).

Here, the ALJ determined that Plaintiff has the residual functional capacity to perform "medium work" except that "due to her bronchial asthma and allergic conditions, she should avoid more than moderate exposure to respiratory irritants such as fumes, odors, dust, gases, poor ventilation, extreme temperatures, and humidity." Tr. at 16. In considering Plaintiff's testimony and the evidence on record, the ALJ concluded that although Plaintiff may have the medical symptoms she complains of, she is capable of following simple instructions, performing tasks with supervision, and handling reasonable levels of simple, repetitive work-related stress. Id. The ALJ

12

determined that Plaintiff is unable to perform any past relevant work as her past work exceeds the limitations set forth in her RFC. Id. at 21. However, the ALJ concluded that based on her RFC, age, education, work experience, and residual functional capacity, there are jobs that exist in the national economy that Plaintiff can perform. Id. at 22.

Plaintiff contends that the ALJ erred in his determination of her RFC. Pl.'s Br. at 8. She asserts that contrary to the ALJ's determination on her capacity to work, she is unable to perform "any other work" because of her severe impairments. Id. Plaintiff asserts that she primarily suffers from nonexertional limitations that impede her ability to perform the demands of virtually any job. Id. Specifically, due to Plaintiff's respiratory symptoms, she is unable to tolerate "<u>even a moderate exposure</u> to dust, fumes, perfumes and molds." Id. Plaintiff argues that there was overwhelming evidence in the record that contravenes the ALJ's finding. Id.

Based on the medical evidence and Plaintiff's medical conditions, it appears undisputed that the ALJ correctly concluded that Plaintiff could not perform her past work. Tr. at 21. In Step Five of his determination, however, the ALJ concluded that Plaintiff could perform the full range of sedentary work and other light and medium jobs. Id. at 22. Although the ALJ's determination may in fact be correct, it is difficult to assess the overall accuracy of the final determination as the ALJ did not take into account the treating source's opinion nor did he provide a justification for concluding the extent of Plaintiff's respiratory nonexertional limitations. Taking such factors into account might influence the ultimate determination on Plaintiff's ability to perform work in the national economy. The ALJ's failure to address these issues supports the finding that the ALJ's determination of Step Five is not supported by substantial evidence. Therefore, the Court remands this matter to the ALJ to provide a complete analysis of Step Five.

*2. The ALJ's Interpretation of Dr. José R. Rabelo's Opinion*

Plaintiff argues that the ALJ failed to properly interpret the medical opinion of consulting physician Dr. Rabelo. Pl.'s Br. at 9. Specifically, Plaintiff asserts that Dr. Rabelo, in his July 4, 2010 report, stated that Plaintiff "should avoid <u>even moderate</u> exposure to dust or fumes, perfumes, molds." Id. Plaintiff contends that the ALJ misinterpreted Dr. Rabelo's opinion as the ALJ determined that Plaintiff should avoid "more than moderate" exposure to such irritants. Id. at 11. Plaintiff argues that Dr. Rabelo's opinion on the severity of exposure is not inconsistent with the medical opinion of Plaintiff's physician, Dr. Michael Lax, as he opined that Plaintiff is totally disabled. Id. at 9-10. Plaintiff argues that the ALJ's finding is against the weight of the evidence.

The record shows that the ALJ concluded that Plaintiff should avoid "more than moderate exposure to respiratory irritants such as fumes, odors, dust, gases, poor ventilation, extreme temperatures, and humidity." Tr. at 16. In doing so, the ALJ assessed the opinions of the physicians that treated Plaintiff as well as the objective medical evidence in the record. Id. However, the Court finds that the basis for the ALJ's opinion in concluding that Plaintiff should specifically avoid "more than moderate exposure" to respiratory irritants is not supported by substantial evidence.

The record shows that among the physicians' opinions that the ALJ evaluated, the ALJ's opinion merely discusses two physicians that pointed to Plaintiff's need to avoid exposure to respiratory irritants. First, in evaluating Dr. Ganesh's treatment of Plaintiff, the ALJ states that Dr. Ganesh recommended that Plaintiff "avoid known respiratory irritants." Id. at 20. However, the ALJ explains that he gave Dr. Ganesh's medical opinion very little weight as "he was non-specific as to in what grade . . . [Plaintiff] should avoid respiratory irritants (moderate or total exposure)."

14

Id. at 21. Next, the ALJ examined the treatment of Plaintiff by Dr. José R. Rabelo. The ALJ found that Dr. Rabelo indicated that Plaintiff "should avoid even moderate but not all exposure to fumes, odors, dusts and gases." Id. The ALJ explains that he gave Dr. Rabelo's opinion substantial weight based on his experience and review of the record. Id. However, it is unclear how the ALJ concluded that Plaintiff should avoid "more than moderate exposure" to respiratory irritants, as such a conclusion is contrary to the weight of the medical evidence cited in the ALJ's opinion.

The Commissioner addresses this issue in his Brief to this Court, however he points to evidence that is irrelevant to the extent of exposure to respiratory irritants that Plaintiff can reasonably endure without suffering some form of physical limitation. Dkt. No. 13 ("Defendant's Brief") at 14-15. Specifically, Defendant contends that Dr. Evans's opinion supports the ALJ's decision, as Dr. Evans determined Plaintiff's disability to be no more than moderate. Id. at 15. However, the issue here is not the level of Plaintiff's *disability*; rather, it is the specificity and extent to which Plaintiff can tolerate certain *respiratory irritants* before such irritants trigger a physical limitation contributing to her disability. Therefore, the ALJ's conclusion that Plaintiff "should avoid *more than moderate exposure* to respiratory irritants" is contrary to the evidence cited and examined.

As mentioned *supra*, in order to determine whether an ALJ's conclusion is based on substantial evidence, "there must be 'more than a mere scintilla' of evidence scattered throughout the administrative record." Cornell v. Astrue, 764 F. Supp.2d 381, 394 (N.D.N.Y. 2010) (citations omitted). Here, the ALJ's determination of the limitations of Plaintiff's exposure to respiratory irritants is partially based on the medical evidence; however it is not wholly justified. The ALJ notes that whenever statements about the intensity, persistence, or functionally limiting effects of

15

pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record. Tr. at 17. However, in this case the ALJ's conclusion that Plaintiff "should avoid more than moderate exposure to respiratory irritants such as fumes, odors, dust, gases, poor ventilation, extreme temperatures, and humidity," is not supported by substantial evidence. Such a conclusion that is not clearly justified on the record requires a remand for further consideration and explanation based on a review of the entire case record.

With regard to Plaintiff's contention that Dr. Rabelo's medical opinion was not inconsistent with that of Dr. Lax, this Court finds this to be an issue of the "treating source rule" which this Court addresses *infra*.

### 3. Treating Source Rule

Under the "treating source rule," the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); Halloran v. Barnhart, 362 F.3d 28, 31-32 (2d Cir. 2004); Shaw v. Carter, 221 F.3d 126, 134 (2d Cir. 2000). Generally, this is because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [Plaintiff's] medical impairment." 20 C.F.R. § 404.1527(c)(2). Essentially, the physicians that are engaged in the primary treatment of Plaintiff are given more deference. See, e.g., Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). However, although the treating physician rule need not be applied if the treating physician's opinion is inconsistent with opinions of other medical records, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the

opinion of the treating physician." Id.

In evaluating whether the treating physician's opinion should be given controlling weight, the ALJ must consider various factors including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." 20 C.F.R. § 404.1527(c)(2); Shaw, 221 F.3d at 14 (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). In addition, the ALJ must set forth the reasons for the weight that he assigns to the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); Shaw, 221 F.3d at 134.

In this case, Plaintiff contends that the ALJ failed to give controlling weight to Plaintiff's attending physician, Dr. Michael B. Lax. Pl.'s Br. at 11. Plaintiff alleges that Dr. Lax qualified as a treating source who rendered a medical opinion that was not inconsistent with the record as a whole. Id. at 11-15. Plaintiff's contention is supported by the ALJ's opinion, as the ALJ failed to provide a sufficient reason for dismissing Dr. Lax's opinion.

In evaluating the objective medical evidence and the opinion of treating physicians, the ALJ examined Dr. Lax's treatment of Plaintiff. Tr. at 19. The record indicates that Dr. Lax had been treating Plaintiff for at least four years, from 2006 through 2010. Id. The ALJ states that Dr. Lax assessed Plaintiff on October 18, 2006 and diagnosed her with asthma, allergic rhinitis, and vocal cord dysfunction – all related to workplace mold exposure. Id. Dr. Lax recommended that Plaintiff could work part time – approximately twenty to thirty hours a week. Id. However, the ALJ indicates that by April 1, 2009 to April 20, 2010, records show that Dr. Lax determined that there was a complete disability. Id.

Although the ALJ ultimately concluded that Plaintiff was not disabled based on the objective

17

medical evidence and opinions provided by the physicians that had treated her, the ALJ did not specify the extent of weight afforded to Dr. Lax's opinion and did not provide a justification for a lack thereof. Even if Dr. Lax's opinion was contrary to the weight of the evidence, the ALJ was nevertheless responsible for providing a justification as to why the treating physician's medical opinion was not taken into account or was not as weighted as heavily as other medical evidence. An ALJ, even if he finds a treating source's opinion to be inconsistent with the record as whole, must still provide reasons for discounting the treating source's medical opinion. In addition, the ALJ's opinion on the weight afforded to the treating physician must be evaluated only after the ALJ has reviewed the four factors outlined above. "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." Burgess, 537 F.3d at 129; see also 20 C.F.R. §404.1527(d)(2) (stating that when the agency does not give the treating source's opinion controlling weight, it must apply the appropriate factors to determine the weight of the opinion, and the agency must "always give good reasons in [their] . . . decision for the weight [they] give [Plaintiff's] treating source's opinion").

     Here, the ALJ seems to have dismissed Dr. Lax's opinion without addressing his reasons for dismissal. The Second Circuit has long held that the "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). In the instant case, the ALJ failed to provide any explanation for his lack of consideration of the treating source's opinion. Although Dr. Lax's opinion is mentioned in the ALJ's decision, there is no indication of the type of weight assigned to his professional opinion nor is there an explanation for dismissing Dr. Lax's opinion altogether. Therefore, on remand, the ALJ must provide his assessment and reasoning on the treating physician's opinion and

its role in the ALJ's final determination.

**D. Remand**

Pursuant to § 405(g) of the Act, district courts have the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). As stated *supra*, the instant case must be remanded due to: (1) the ALJ's failure to provide sufficient reasoning for his conclusion of Plaintiff's respiratory limitations; and (2) the ALJ's failure to consider and assess on the record the weight given – and the reason for the weight given – to Plaintiff's treating sources' opinion. Accordingly, the ALJ's failure to provide sufficient reasoning on the record leads the Court to conclude the ALJ's final determination on Plaintiff's disability is not supported by substantial evidence. On remand, the ALJ is required to review the record and provide a basis for his conclusion on each of the aforementioned issues.

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED** and that this case is **REMANDED** for further proceedings in accordance with this opinion; and it is further

**ORDERED**, that Plaintiff's Motion for judgment on the pleadings (Dkt. No. 11) is **GRANTED, consistent with this Memorandum-Decision and Order**; and it is further

**ORDERED**, that Defendant's Motion for judgment on the pleadings (Dkt. No. 13) is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this order on all parties by regular mail.

**IT IS SO ORDERED.**

DATED: September 28, 2012
Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge